UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-CIV-14300-MIDDLEBROOKS/LYNCH

ACCESS FOR AMERICA, INC.
a Florida not-for-profit corporation,
and JOHN McNEILLY, an individual

vs.

SPEEDWAY SUPERAMERICA, LLC,
a foreign limited liability company

_____/



### SANCTIONS ORDER

THIS CAUSE comes before the Court upon the Sanctions Hearing heard before the undersigned on March 10, 2003. The Court previously determined that sanctions were warranted due to Plaintiffs' counsel, Mr. Lawrence A. Fuller's ("Fuller") failure to conduct a reasonable pre-suit inquiry. The Court's numerous prior orders regarding this matter make a full recitation of the facts unnecessary. However, the Court briefly recites the relevant pieces of this case's history as follows.

Plaintiffs Access For America ("Access") and John McNeilly ("McNeilly") filed suit in October of 2001. The Complaint alleged that McNeilly was a member of the Access, the organizational plaintiff, that he suffered from quadriplegia, that he had visited the place of public accommodation owned by Defendant Super Speedway ("Speedway") in the past, and had been denied services due to his disability, and that he planned on returning to Speedway in the future.

Despite his quadriplegia, McNeilly walked into his deposition on April 16, 2002.[1]

---

[1] The deposition had been previously scheduled to occur at an earlier date, but had been reset allegedly due to McNeilly's hospitalization and medical condition.

During the deposition, he testified that: (1) he had at no time ever been confined to a wheel chair fully incapable of ambulating; (2) he had used a wheel chair for short periods of time because of some swelling of his feet, but that during such periods, he was at all times capable of ambulating without the wheelchair; (3) he only remembered authorizing between five and ten suits to be filed on his behalf; (4) he was not sure whether he was a member of Access; (5) he had never met Mr. Fuller, his lawyer, before the deposition; (6) he could not recall which Speedway station(s) he had had an access problem with; (7) he could not recall if the problem(s) still existed or not; (8) he has never had a handicapped parking permit; (9) he had never seen nor reviewed the Complaint; and (10) he was unaware that he had been alleged to be a quadriplegic.[2]

Almost two months after "discovering" that his client was not a quadriplegic, Mr. Fuller filed a motion to take a voluntary dismissal of the matter,[3] but Speedway objected to any dismissal absent an award of attorney's fees, and subsequently filed a motion for attorney's fees and costs pursuant to 28 U.S.C. §1927. The Court dismissed the case and granted Speedway's motion for fees and instructed the parties to attempt to come to some type of resolution over the fee matters. They were unable to do so, and so the Parties returned to the Court for resolution of the matter of fees.

In evaluating the Motion for Attorney's Fees, the Court became apprised of and extremely concerned with what appeared to be, at best, extremely sloppy legal work, and at

---

[2] In fact, McNeilly did not know what a quadriplegic was, and when the term was explained to him, he was repulsed by the thought of being so incapacitated and surprised that he had been thought to be so.

[3] He also filed an emergency motion to extend the safe harbor period under Rule 11 discussed *infra* (DE 28).

2

worst, deliberately fraudulent filings Accordingly, the Court ordered Fuller to provide specific information regarding the relationship between himself, Access, other advocacy organizations he represents, and McNeilly.[4] Fuller was also ordered to provide copies of McNeilly's medical records, copies of all authorizations for suit signed by Mr. McNeilly, and:

> any invoices, receipts, checks, disbursements and/or other financial records relating to Fuller & Fuller's representation of and relationship to both the corporate and individual plaintiff, including the amounts received as attorney's fees for any cases settled before trial, and how such funds were distributed. Specifically, please provide any information regarding payments to Access America or John McNeilly

Mr. Fuller produced most of the requested documents, and a hearing was held on March 10, 2003 to determine to what extent the Court should enter sanctions against Mr. Fuller.[5] We have carefully scrutinized the documents produced by Fuller, as well as the entire record in this and some forty-nine other suits wherein McNeilly was a named individual plaintiff, and make the following observations:

1.  The following six suits were filed in the Southern District of Florida indicating that Mr. McNeilly suffered from quadriplegia:[6]

    01-civ-14286 <u>Access & McNeilly v. Greyhound Real</u>
    (filed September, 2001- closed January, 2002)

    01-civ-14287 <u>Access & McNeilly v. Killavaney Property</u>
    (filed September, 2001 - closed March, 2002)

    01-civ-14288 <u>Access & McNeilly v. St. Lucie Palm</u>

---

[4] Mr. Fuller represents a potpourris of advocacy groups. Out of those groups, McNeilly has appeared as the named individual Plaintiff in cases involving Access and one entitled Access 4 All.

[5] There Court found no basis for contemplating sanctions against McNeilly.

[6] This list does not include the instant action.

3

>   (filed September, 2001 - closed July, 2002)
>
>   01-civ-14321 Access & McNeilly v. Village Shops
>   (filed October, 2001 - closed June, 2002)
>
>   01-civ-14322 Access & McNeilly v. Lauderdale-Regency
>   (filed October, 2001 - closed January, 2002)
>
>   01-civ-14323 Access & McNeilly v. H.B. Associates;
>   (filed October, 2001 - closed January, 2002)

2.  Through independent research, the Court discovered an additional six cases filed by Mr. Fuller in the Middle District of Florida wherein it was asserted that McNeilly was a quadriplegic:

    >   6:01-1260-civ Access & McNeilly v. Republic Bank
    >   (filed October, 2001 - closed April 26, 2002)
    >
    >   6:01-1287-civ Access & McNeilly v. Desantis[7]
    >   (filed November, 2001 - closed May, 2002)
    >
    >   6:01-1321-civ Access & McNeilly v. Slabine
    >   (filed November, 2001 - closed May 2002)
    >
    >   6:01-1322-civ Access & McNeilly v. Stratford Ent.
    >   (filed November, 2001 - closed September 2002)
    >
    >   6:01-1323-civ Access & McNeilly v. Harbor City Ctr.
    >   (Filed November, 2001 - closed August, 2002)
    >
    >   6:01-1324-civ Access & McNeilly v. Palm B.C.V., Ltd.
    >   (Filed November, 2001 - closed June, 2002)[8]

---

[7] The record in this case reflects that Plaintiff amended the Complaint on March 15, 2002, indicating that it he knew as early as March that McNeilly did not suffer from quadriplegia as previously asserted. Also telling, is the fact that the Amended Complaint asserted that (1) " John McNeilly suffers from a mobility impairment due to a back operation and diabetes" and (2) "Mr. McNeilly uses a wheelchair to ambulate." Such assertion of use of a wheelchair is simply not supported by the medical records, nor by McNeilly's testimony. (2d Amend. Compl. ¶ 7).

[8] Fees were granted by the court in this matter in November, 2002.

3. Fuller settled several of the above cases, and obtained attorney's fees in them before McNeilly's deposition occurred. In those cases that were not settled before the deposition date, none of the records reflect any amendment to correct the false quadriplegia assertion. These records also do not contain any indication that the relevant defendants were informed as to the true nature of McNeilly's ambulatory capabilities.

4. Fuller continued to prosecute subsequent cases involving McNeilly, wherein McNeilly was alleged to suffer from a severe mobility impairment and was unable to ambulate without the use of a wheelchair;[9]

5. McNeilly's medical records do not support a representation that he suffers from quadriplegia;

6. McNeilly's medical records do not support an assertion that he suffers from a severe mobility impairment requiring the use of a wheelchair for ambulation;

7. McNeilly's medical records do not support a finding that he is a "person qualified as disabled" under the ADA;

8. Fuller has filed over forty claims on behalf of Mr. McNeilly. He submitted thirty-five authorizations to sue allegedly signed by Mr. McNeilly. McNeilly only remembers signing a few.[10]

9. Mr. Fuller provided closing/distribution forms for less than half the claims his firm filed with Mr. McNeilly as the named individual plaintiff;

10. Mr. Fuller provided closing/distribution information for only six out of the thirteen "quadriplegic" suits set forth in items 1 & 2;

11. The records of the thirteen "quadriplegic" suits bear no indication whatsoever that Mr. Fuller made a full disclosure as to the true nature of Mr. McNeilly's lack of disability;

---

[9] See e.g. Case No. 01-CIV-14070, Access for All & John McNeilly vs. JSL Equity (wherin McNeilly was alleged to be unable to ambulate without use of a wheelchair - settled in July, 2002); 02-CIV-80068, Access for All & John McNeilly vs. Neptune Warehouse (settled June, 2002; 02-14076, Access for All & John McNeilly vs. Floyd Investments (settled in December, 2002). These are just illustrations, and not necessarily a complete list. Fuller received several thousands of dollars in fees in each of these matters

[10] The Court notes that many of these authorizations are undated, or appear to be possible replications of a prior authorization's signature placed with a new defendant entity.

5

12. Mr. Fuller continued to prosecute the above claims, and appears to have accepted attorney's fees for most of them;[11]

13. Mr. Fuller has represented plaintiffs in over six hundred disability access suits since 1999;[12]

14. A majority of those six hundred cases involved advocacy groups requesting injunctive and declaratory relief and seeking attorney's fees;

15. Based upon the 95 closing statements Fuller submitted for the Court's in camera inspection, the Court has calculated that a fair approximate of the average fee amount Fuller earned/negotiated per case was approximately $5,100.00 after subtracting expert fees and costs related to filing;[13] and

16. Multiplication of the average after-cost amount per claim by 600 results in a conservative figure of over three million dollars in attorney's fees since the end of 1998.

Mr. Fuller's initial response to the Court's determination that sanctions were warranted was the response that Access could have at all times proceeded in the instant action without Mr. McNeilly because Access consists of a membership base of disabled persons.[14] Accordingly,

---

[11] This appears to be the case. Fuller did not provide closing statements for all of the quadriplegic cases. The Court notes that the closing statements submitted reflects no fees were documented in 01-14232 indicating that all cases have a closing statement, even when no fees are collected. Accordingly, the Court makes no inference that cases without closing statements resulted in no fees.

[12] Some of the advocacy groups are: (1) Advocates for the Disabled; (2) Access Now, Inc.; (3) Disability Advocacy and Access Network, Inc.; (4) Access for the Disabled, Inc.; (5) Disabled Patriots, Inc.; (5) Access for America, Inc.; and (6) Access 4 All.

[13] The Court notes that the disbursement summary included copies of the checks coming into the firm, but did not include substantiation or expense for the expert fees or costs via either invoice or copies of checks. The average of the actual amount recovered absent these costs was approximately $7,500.00 per case. The Court further notes that most of the complaints reviewed were virtually identical and the dockets uncomplicated.

[14] Access provided the Court with its membership roster indicating that it was composed of some forty-five members with a multitude of disabilities from a "bad heart" to "quadriplegia." Mr McNeilly was listed as "2 discs removed from back, diabetes, feet swell."

6

said Fuller, that meant that Access was capable of sustaining an action against the Defendant under the doctrine of associational, or representational standing, and that therefore, his mistaken allegation as to McNeilly's quadriplegia did not result in any prejudice to the Defendant. The Court dismissed such assertion as having no legal basis in the context of this sanctions matter.[15] By the time of the sanctions hearing, Mr. Fuller conceded that imposition of sanctions was appropriate. Specifically, the hearing opened as follows when the Court asked Plaintiffs what they felt was appropriate:

| | |
|---|---|
| The Court: | Okay Mr. Josefsberg, what should we do with this case. |
| Mr. Josefsberg: | I think you should impose sanctions, and I'm not here to convince you otherwise. |

However, he asserted at the hearing, and in more recent pleadings, that the awarding of Defendant's requested attorney's fees would be a windfall for those attorneys and not an appropriate sanction.

The Court now must assess what sanctions are appropriate to deter future repetitions of this type of behavior by Fuller or others. 28 U.S.C. §1927 provides that:

> Any attorney . . . admitted to conduct cases in any court of the
> United States . . . who so multiplies the proceedings in any case

---

[15] Despite Plaintiff's assertions, this Court has never held that an advocacy association has per se standing to pursue the claims of its representatives. Rather, the Court has determined that, at the motion to dismiss stage, having to take the facts alleged in the complaint to be true, as it must, when an advocacy association asserts that one of its members has been denied access and is likely to be denied future access due to a disability, the Court need not dismiss an advocacy association for lack of naming the individual member. This situation involves a rather different posture than that seen at the motion to dismiss stage of pleading, and at no point did Fuller allege that any other individual had been denied access at Defendant's facilities.

>unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred be cause of such conduct.

The key to unlocking the Court's powers to invoke sanctions under this section is a finding of bad faith. *Byrne v Nezhat*, 261 F.3d 1075, 1106 (11th Cir 2001)( relying on *Barnes v Dalton*, 158 F.3d 1212, 1214 (11th Cir 1998)); *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)(citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L. Ed.2d 27 (1991).

However, sanctions can be awarded under this section in cases lacking credibility from the outset, such as when an attorney fails to adequately investigate the factual basis for the allegations contained in the Complaint. *See Sullivan v. School Bd Of Pinellas Cty.*, 773 F.2d 1182 (11th Cir. 1985). Attorneys are responsible for investigating the claims of a lawsuit prior to filing. *Beard v. Annis*, 730 F.2d 741 (11th Cir. 1984). This obligation continues throughout every stage of the proceedings. *See Avirgran v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991). "When it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest." *Id.* In other words, when it becomes apparent that a claim is baseless, it is an attorney's duty to seek voluntary dismissal.

In this case, Fuller did ultimately seek voluntary dismissal. However, he did not do so for almost two months after he realized that McNeilly was not a "quadriplegic " Further, this application is not entirely on point because had Fuller ever bothered to meet with his client or review his medical history, it would have been readily apparent at the outset that the Complaint lacked a good-faith basis. Additionally, Fuller continued to actively prosecute claims in which McNeilly was alleged to be either quadriplegic or so severely impaired in his mobility that he

8

required use of a wheel chair for ambulation.

Further, Fuller appears to have taken the same lack of care in other cases. For example, this same " evolution to quadriplegia" seems to have occurred in other Fuller cases involving a plaintiff named Doug Wilder, another member of Access. In his earlier suits, Fuller represented that Wilder was a "person qualified as an individual with disability" under the ADA in May of 2001. By December of that same year, he was "suffering from Quadriplegia."[16] *See Access for America & Douglas Wilder v. Orange Pine Ltd. Partnership*, Case NO. 6:01-281-Civ (M.D. Fla. 2001); *Access for America & Douglas Wilder v. Lembo*, Case No. 6:01-2354 (M.D. Fla. 2001).

The difference between a 'person qualified as disabled' and a "quadriplegic" is not a minor one as the greater, or more profound, the disability, the greater the extent of injunctive relief that can be requested and granted.[17] For example, the vast majority of courts considering the scope of injunctive relief available under Title III have held that an representational plaintiff is limited to the relief applicable to the named plaintiff in a denial of access case. In other words, if the named individual plaintiff was a blind person, then the advocacy group of which that blind plaintiff is a member may not ordinarily obtain injunctive relief for barriers unrelated to blindness, absent proof of actual or imminent injury due to another disability.

---

[16] The Court makes no assertion that the "worsening plaintiff" occurrences described herein are intentional, it does note that, at the very least, they are worrisome. Mr. Wilder is listed on Access's membership list as having multiple sclerosis. While multiple sclerosis may result in severe mobility impairment, the Court is of the belief that it is medically different than "quadriplegia."

[17] *Cf. Access 4 All, Inc. V. Floyd Investments, Ltd.*, Case No. 02-14076 - Civ - Paine (holding that organizational plaintiff is not limited to asserting claims limited to only the individually named plaintiff, but rather may assert claims represented by all of its members) This holding is not binding upon the Court, and the undersigned does not find the specific language of Title III's injunctive enforcement provision to support it.

Similarly, a wheelchair bound person would be unable obtain relief for barriers related to blindness. Allowing an advocacy group standing to complain about and require remedy of all violations on behalf of all disabled individuals would expand the standing doctrine beyond the limits of Article III  *See Lewis v. Casey,* 518 U.S 343, 358 n.6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

In this particular case, however, McNeilly was alleged to suffer from quadriplegia, a disability which has many potential access issues, and the fact of the matter is that this is not a case where an attorney conducted a reasonable inquiry into the facts underlying the plaintiff's claim and then much to his surprise discovers that his claim does not have validity. Rather, this is a case where an attorney proceeded with no investigation as to the merits of the claim whatsoever.

The Court notes that some of the "quadriplegic" suits listed above were dismissed, some with orders reading "each party bearing its own costs and fees." However, there is no indication that they were dismissed due to Fuller's disclosure of McNeilly's status, and such cases were the exception. The records indicate that for the most part, Fuller continued to prosecute all of the McNeilly "quadriplegic" cases. He also continued to prosecute several cases in which McNeilly was alleged to a person with severe mobility impairment requiring use of a wheel chair for ambulation.[18] Further, the filings indicate that Fuller in fact has on more than one occasion obtained fees in cases in which the dismissal order read "each party to bear its own costs and

---

[18] While the Court is not sanctioning Fuller for conduct not properly before it, it utilizes these other cases to determine whether Fullers actions were reasonable or taken in bad faith  It also utilizes them to determine Fuller's ability to pay the proposed sanctions as required by Eleventh Circuit precedent.

10

fees."[19] Accordingly, the fact that a dismissal order declared that each party was to bear its own costs and fees does not mean that Fuller did not obtain fees in a dismissed case.

In summary, the Court finds that this complete lack of investigation, coupled with the numerous complaints filed without such investigation, together with the lack of any remedial action in other suits leads to no other conclusion than these cases were brought with either intentional or reckless disregard of Fuller's duty to the Court and to the Bar in general. Accordingly, the Court finds that this establishes bad faith sufficient to warrant imposition of sanctions pursuant to Section 1927.

Alternatively, sanctions are also appropriate under Rule 11, which provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that [this rule] has been violated, the court may . . . impose an appropriate sanction upon the attorneys, law firms, or parties . . . responsible for the violation." Rule 11 also provides that "[b]y presenting [a pleading, motion or other paper] to the court . . . an attorney . . . is certifying that to the best of [his or her] knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances* . . ." that the pleading:

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) *the allegations and other factual contentions have evidentiary support* or, if specifically so identified, are likely to have evidentiary support after a reasonable

---

[19] *See e.g.* Access 4 All & John McNeilly vs. Stenick Partners Case No. 6:02-227 (M.D. Fla.)(dismissing case with "each party to bear its own costs and fees" while fees in excess of $6,000.00 were obtained by Plaintiffs).

11

> opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence, if specifically so identified are reasonably based on a lack of information or belief.
> . . .

FED. R. CIV. P. 11. (emphasis added).

Rule 11 also provides that any sanction imposed under the rule must provide notice to the attorney of its intent to impose sanctions, the specific behavior for which it feels sanctions are warranted, and an opportunity to be heard on the issue of why sanctions are not appropriate. It is undisputed that Mr. Fuller has been fully informed of the conduct complained of, the Court's intention to impose sanctions, as well as a full opportunity to both (a) be heard on all issues, and (b) come to some agreement with Defendant as to the nature of such sanctions. As the Parties were unable to come to such agreement, the Court must determine what sanctions are appropriate as the Rule requires that any sanction imposed must be "limited to what is sufficient to deter repetition such conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(2).

The Court again notes that while the question of whether Access could have maintained this suit without McNeilly is not the issue before it, consideration of the merits of such assertion is necessary in the context of determining the egregiousness of Fuller's conduct under Rule 11. It is undisputed that McNeilly has not now, nor did he at the time the Complaint was filed have standing to bring suit on his own behalf.[20] However, Fuller has asserted that because Access could have maintained this suit without McNeilly, there has been no multiplication of

---

[20] In his deposition, McNeilly conceded that he was not "denied access" at any of Defendant's places of accommodation. He was assisted and reasonably able to obtain access to all services.

12

proceedings due to the mistaken allegation to McNeilly's disability. The Court simply disagrees with this assertion.

Under Rule 11 the Court evaluates whether the Complaint had any merit at the time that it was filed. The Court evaluates the attorney's conduct as of the time of filing the offensive pleading with an objective standard in order to determine whether a reasonable attorney would have filed such a pleading with the information available at the time of its filing. *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001).

Traditionally, in disability cases such as the one presented here, an advocacy group, along with a named disabled plaintiff, files suit against a public establishment pursuant to Title III of the Americans with Disabilities Act ("ADA").[21] To state a prima facie case of disability discrimination under this Title, an individual plaintiff must show that (1) he or she is disabled; (2) the structure or edifice in question is a place of public accommodation as contemplated by the ADA; and (3) that he or she was denied full and equal treatment because of his or her disability, and (4) that he or she will likely be denied full and equal access in the future due to the same disability. *See Ass'n. For Disabled Americans, Inc. v. Concorde Gaming Corp and Goldcoast Entertainment Cruises*, 158 F.Supp.2d 1353, 1359-61 (S.D. Fla. 2001).

The Eleventh Circuit has not yet addressed organizational standing as it relates to Title III of the ADA. It has however, addressed the concept of organizational standing, and accordingly, the law is well established that an organizational plaintiff such as Access may bring suit on

---

[21] Title III provides, in pertinent part that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of any place of public accomodation by an person who owns . . . or operates a place of public accommodation. 42 U.S.C. §12182(a).

13

behalf of its members without a showing of actual injury to the association itself under the concept of organizational or representational standing set forth in *Warth v. Seldon*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999).

"The concept of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III [of the Constitution]." *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct 2130, 119 L.Ed.2d 351 (1992). The Supreme Court has held that to have standing under Article III, a plaintiff must establish that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not merely conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to being merely speculative, that the injury will be redressed by a favorable decision." *Id.*; *Access Now, Inc. & Edward Resnick v South Florida Stadium Corp., et al.*, 161 F. Supp 2d 1357, 474 (S.D. Fla. 2001).

Organizational plaintiffs purporting to represent the interests of its members must, in addition to the above, establish that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organizations purpose; and (c) neither the claim asserted nor the relief requested requires participation by individual members in the lawsuit. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct 2434, 53 L.Ed.2d 383 (1977); *Warth v. Seldin*, 422 U.S. at 511; *Doe v. Stincer*, 175 F.3d at 882

Fuller has implied that *Doe* has made it unnecessary for a disability advocacy organization to provide a named plaintiff because of the following statement: "we have never

14

held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought . . . it is enough for the representative entity to allege that one of its members . . . has suffered an injury that would allow it to bring suit in its own right." *Doe*, 175 F.3d at 884-884.

In *Doe*, a law student was hospitalized for several days for observation after what appeared to be a suicide attempt. Concerned with what her medical records would disclose about her mental health, the student attempted to obtain her medical records of the hospitalization so as to make proper disclosure to the Florida Bar. The Hospital and its physicians refused to provide the student with copies of her medical records due to a Florida Statute that limited access to mental health records. An advocacy group filed suit on her behalf and on behalf of other unnamed mentally ill patients denied access to their medical records. The defendants challenged the advocacy group's standing as applied to the unnamed patients. The Eleventh Circuit found that the group did not need to name an individual patient to have standing.[22] In *Doe*, however, the Eleventh Circuit considered an advocacy group's standing in the presence of a specific congressional grant of organizational standing.

The Statute involved in *Doe* was PAMII, a federal statute that established an advocacy system for individuals with mental illnesses to "protect and advocate the rights of such individuals . . . ." *Doe*, 175 F.3d at 883.[23] Under PAMII, an advocacy group was empowered with " the authority to . . . pursue . . . legal . . . remedies to ensure the protection of individuals

---

[22] The Court did however find that the group had not presented any allegation of an injury in fact or real threat of future injury as required by Article III.

[23] *Doe* also analyzed PAIR, another congressional grant of advocacy authority and determined it to be analogous to PAMII resulting in an identical conclusion.

15

with mental illness . . . ." *Id.* Confusion within the district appears to exist as to the applicability of *Doe v. Stincer* to these access cases, and the organizational standing requirements applicable to disability advocacy groups. Specifically, some judges in the District have read *Doe* to permit standing to any advocacy group alleging a violation under Title III for any denial of access which might affect one of its members irregardless of whether the organization has named an individual plaintiff.[24] Additionally, one court has read *Doe* so liberally as to provide that the scope of injunctive relief available to an advocacy under Title III is only limited by the disabilities of all of the groups members, as opposed to the disability of the injured individual plaintiff.[25]

Unlike PAMII, however, Title III of the ADA has a specific limitation on standing to "any person who is being subjected to discrimination on the basis of a disability . . . or who has reasonable grounds for believing such person is about to be subjected to discrimination in violation of . . . [the ADA]." 42 U.S.C §12188(a)(1)(2001). I am persuaded by those courts which have found that Title III language provides a specific limitation which results in requiring an advocacy organization to establish an Article III injury in fact under *Hunt*. This may be done by "requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, [a valid] claim." *Hunt*, 432 U.S. at 555-56; *Doe*, 175 F.3d at 882; *Access Now, Inc. v. South Florida Stadium Corporation*, 161 F. Supp.2d 1357, 1364

---

[24] *See* Case No. 01-7209 - CIV-DIMITREOULEAS, *Access for the Disabled, Inc. v. Splitting Ates, Inc.* (S.D. Fla.); Case No. 96-1272-CIV-HIGHSMITH, *Association for Disabled Americans, Inc. v. Amnesia International, Inc.* (S.D. Fla.). These cases, and others relied upon by Fuller, however, dealt with standing at a preliminary motion to dismiss stage where the facts alleged in the complaint were taken to be true.

[25] *See* Case No. 02-14076 - CIV-PAINE (S.D. Fla.)(holding that advocacy group may bring claims for injunctive relief for access barriers applicable to all its members).

(S.D. Fla. 2001); *Association for Disabled Americans, Inc. v. Concorde Gaming Corp.*, 158 F.Supp 2d 1353, 1363-64 (S.D. Fla 2001); *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 884 F.Supp. 487 (S.D. Fla. 1994); *Alliance for ADA Compliance, Inc., et al. v Weston Town Center, LLC*, Case NO. 01-7906-CIV-UNGARO- BENAGES(S.D. Fla. 2002)

This perspective is supported by the Eleventh Circuit's opinion in *Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001). In *Shotz*, the Court held that in order to state a valid claim under Title II of the ADA, an individual plaintiff must establish, at an irreducible minimum, an injury in fact caused by the challenged act of the defendant. *Id* at 1081. Further, as the *Shotz* plaintiffs were seeking injunctive relief, they also had to establish a "real and immediate- as opposed to a merely conjectural or hypothetical- threat of *future* injury." *Id.* (emphasis in original).

In conclusion, and as discussed above in consideration of sanctions pursuant to §1927, at the very minimum, to be reasonable, an attorney must conduct a reasonable pre-filing inquiry as to the veracity of the facts alleged in the complaint. *See Threaf Properties, Ltd. v. Title Ins. Co. Of Minnesota*, 875 F.2d 831, 835 (11th Cir. 1989). "If an attorney has failed to conduct a reasonable inquiry into the matter, then the court is obligated to impose sanctions even if the attorney had a good faith belief that the claim was sound." *Worldwide Primates, Inc. V. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996); *In re Mroz* 65 F 3d 1567, 1573 (11th Cir 1995).

In determining the proper sanction, the Court has considered the testimony given at the hearing and all filings submitted thus far. Defendants requested, and the Court granted, that it receive its reasonable fees incurred in defense of this action  The Court has reviewed the time records submitted by Defendant's counsel and finds that they are reasonable and that there is no

17

excessive billing or billing for matters otherwise attributable to another case. Accordingly, it is

ORDERED and ADJUDGED that Fuller pay to Defendant the requested $43,323.90 in Attorneys Fees and Costs consisting in $35,749.22 in attorney and paralegal fees, $6,196.68 in costs and expenses and $1,378.00 in travel and subsistence expenses for Corporate Counsel and Corporate Representative travel necessary to this case. The Court specifically finds that such sanction is not an undue financial burden given the amount of fees Fuller has received in the quadriplegic cases alone. The amount, however, is high enough to hopefully deter repetition of this type of activity by Fuller and all other attorneys representing disability advocacy groups.

It is further ORDERED and ADJUDGED an additional sanction of a one-year mandatory supervision of a special master be imposed as suggested by Fuller and his counsel. David Lichter, Esq. is hereby appointed special master. Such special master shall review all Complaints filed by Fuller and his firm, and be provided whatever support is necessary, to ensure that proper pre-suit investigation has been conducted. The special master shall also determine whether additional disclosures should be made to opposing counsel with respect to any of the settled cases involving McNeiily or with respect to any other cases. Fuller & Fuller, P.A. shall pay all costs associated with the duties of the special master.

DONE and ORDERED in Chambers, at West Palm Beach, Florida this _____ day of April, 2003.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:   Lawrence A. Fuller, Esq.
             Robert C. Josefsburg, Esq.
             Susan Potter Norton, Esq.

Copies to:   Lawrence A. Fuller, Esq.
             Robert C. Josefsburg, Esq.
             Susan Potter Norton, Esq.